## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **BYRON CHAMP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:19-CV-345-MAB** |
| | ) | |
| **CHERYL SIMMONS,** | ) | |
| **CARRI MORRIS, SHIRLEY FORCUM,** | ) | |
| **RHIANA DRAPER,** | ) | |
| **NAGESWARARAO VALLABHANENI,** | ) | |
| **and WAYNE WOMAC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by Defendants Nageswararao Vallabhaneni (Doc. 140; *see also* Doc. 141) and Defendants Cheryl Simmons, Carri Morris, Shirley Forcum, Rhiana Draper, and Wayne Womac (Doc. 142). For the reasons explained below, both motions are granted.

### BACKGROUND

Plaintiff Bryon Champ filed four separate and distinct *pro se* lawsuits alleging violations of his constitutional rights under 42 U.S.C. § 1983, for events arising out of his involuntary confinement as a pretrial detainee at Chester Mental Health Center from April 5, 2018 through August 29, 2018. *See* SDIL Case Nos. 18-cv-1986 (Doc. 18); 19-cv-26 (Doc. 14); 19-cv-263 (Doc. 17); and 19-cv-345 (Doc. 22).

This case and case 18-cv-1986 are somewhat similar. In 18-cv-1986, Plaintiff alleged that Dr. Nageswararao Vallabhaneni, Carri Morris, and Shirley Forcum interfered with his constitutional right to access the Courts (*see* Doc. 143, pp. 8, 9). *See also* SDIL Case No. 18-cv-1986, Docs. 187, 154, 18. And in the instant case, Plaintiff is proceeding on a First Amendment claim against Dr. Vallabhaneni, Morris, Forcum, Cheryl Simmons, Rhiana Draper, and Wayne Womac for retaliating against him by interfering in his lawsuits and legal work (Doc. 22). While the claims may sound similar, Plaintiff was very clear that there is no overlap between his claims in this case and in 18-cv-1986 (Doc. 143, pp. 8, 9, n.1, 17, n.2).

In case 18-cv-1986, Plaintiff alleged that the defendants prevented him from pursuing two lawsuits that he had pending at the time he arrived at Chester, which both pertained to excessive lockdowns at the Winnebago County Jail, by failing to have him transported for a court hearing in Winnebago County and denying him access to legal materials and the law library (Doc. 143, pp. 8, 9, n.1, 17, n.2). *See also* SDIL Case No. 18-cv-1986, Docs. 187, 154, 18. While in this case, Plaintiff alleges that, in retaliation for filing grievances and lawsuits, Defendants failed to properly safeguard, transfer, and/or return his personal property boxes containing his legal documents and legal research by causing them to either be lost or sent to an improper address following his transfer from Chester, which in turn interfered with his ability to conduct legal work on his existing cases and/or to file new cases (Doc. 143, pp. 9–10, para. 2, 3; *see also id.* at p. 9 n.1; Doc. 142, pp.

2, 9–10). In other words, this case is solely about Plaintiff's legal boxes going missing when he was transferred out of Chester.[1]

Defendants filed their motions for summary judgment in February 2023 (Docs. 140, 142). Plaintiff's recruited counsel filed a response in opposition on his behalf (Doc. 143). None of the Defendants filed a reply.

In this Order, the Court addresses only the facts and arguments as they pertain to Plaintiff's legal boxes going missing when he was transferred out of Chester. The Court does not address, for example, anything related to a failure to coordinate court dates in his excessive lockdown cases, interference with his legal mail, the inadequacy of the law library at Chester, or denial of access to legal forms and/or his legal materials on a day-to-day basis, which were all topics discussed by Defendants in their motions for summary judgment (*see* Doc. 141, Doc. 142).

## FACTS

In 2018, Plaintiff was incarcerated as a pre-trial detainee at the Winnebago County Jail awaiting trial on charges of felony aggravated domestic violence (Doc. 143, p. 7).[2] During the course of Plaintiff's criminal proceedings, Plaintiff was involuntarily committed to Chester on April 5, 2018, after he was found unfit to stand trial based on

---

[1] The Court greatly appreciates the efforts of Plaintiff's counsel to make clear the nature and scope of Plaintiff's claims in this case.

[2] The Court's citations to Doc. 143, which is Plaintiff's response brief in opposition to the motions for summary judgment, denote that a particular fact is undisputed. It is either a fact that Plaintiff admitted, or a fact that Plaintiff asserted and Defendants did not deny.

his refusal to cooperate with his public defender (Doc. 143, pp. 1, 7). Plaintiff remained at Chester until August 29, 2018 (Doc. 143, p. 13; *see also* Doc. 143-3 (discharge report)).

During Plaintiff's involuntary commitment to Chester, Dr. Vallabhaneni was employed as a staff psychiatrist (Doc. 143, p. 8). Shirley Forcum was the Unit Director of the unit where Plaintiff was housed (Doc. 143, p. 3). Carri Morris was a social worker assigned to work with Plaintiff (Doc. 143, p. 3).[3] Rhiana Draper was a social worker who began working with Plaintiff approximately a week before he was discharged (Doc. 143, p. 6). Cheryl Simmons was the office coordinator for Plaintiff's unit, and Wayne Womac worked as a forensic coordinator at Chester (Doc. 143, pp. 4, 5).

When a patient arrives at Chester, their property, including paperwork, is inventoried and sent to the property department, where it is kept with the exception of items that the patient is allowed to keep in their room (Doc. 143, pp. 2, 4, 10, 12). When a patient is discharged from Chester, the counselor/social worker fills out a form titled "Authorization to Forward Patient Possessions" using information provided by the patient (Doc. 142-6, pp. 12–13 (Draper depo); *see also* Doc. 142-3, pp. 66, 67 (Morris depo); Doc. 142-4, p. 16 (Simmons depo)). The patient signs the form and then turns the form in to the property department (*see* Doc. 142-6, pp. 13–14 (Draper depo); *see also* Doc. 142-3, pp. 66, 67 (Morris depo); Doc. 142-4, pp. 14, 16 (Simmons depo)). The property department verifies all of the patient's belongings are in the box and then sends it to "whatever address [the patient] signed for" (Doc. 142-6, pp. 13–14 (Draper depo)). Carri

---

[3] Plaintiff referred to her as his therapist.

Morris likewise testified that the counselor's involvement is limited to filling out the form and turning it in (Doc. 142-3, p. 68). The counselor is not actually responsible for sending the property anywhere (*Id.*).

Plaintiff's property was inventoried when he arrived, and included four legal boxes (Doc. 143, p. 10; *see also* Docs. 143-1, 143-2 (inventories); Doc. 142-3, p. 61, 77–78 (Morris depo)). Plaintiff testified that his property included correspondence from the courts and legal research, his Social Security card, and his state ID card, amongst other things (Doc. 143, pp. 10–11; *see also* Doc. 142-1, pp. 51, 111–12 (Plaintiff depo)).

During his time at Chester, Plaintiff submitted a number of grievances (Doc. 143, p. 8; *see also* Doc. 142-1, p. 20-23 (Plaintiff depo)). Additionally, at the time of his admission to Chester, Plaintiff had two ongoing lawsuits against Winnebago County officials for excessive lockdowns while he was housed at Winnebago County Jail.

On August 8, 2018, Carri Morris filled out the top portion of an "Authorization to Forward Patient Possessions" form (Doc. 143, pp. 3, 11; *see also* Doc. 143-4). The form stated:

> Upon my discharge, please send my personal possessions (i.e., clothing, property and money) to the following address:
> ~~Willie Brown / Eugene Batten~~ John Hazlewood
> Rockford Rescue Mission
> C/O Bryon Champ (Property)
> 715 W. State St., Rockford, IL 61102

(Doc. 143-4; *see* Doc. 142-3, pp. 66–67 (Morris depo)). The form was signed by Plaintiff and witnessed by Morris (Doc. 143-4).

Defendant Morris testified that she filled out the form with information provided to her by Plaintiff in preparation for his discharge from Chester and that Plaintiff wanted his property sent to the Rockford Rescue Mission, which is a homeless shelter, when he was discharged from Chester (Doc. 143, p. 12; *see also* Doc. 142-3, pp. 66, 67 (Morris depo)). Plaintiff, on the other hand, testified that he did not sign anything (Doc. 141-3, p. 42 ("No, I ain't sign no release. . . . Why would I sign a release form that had my stuff sent to a shelter and I'm not there?")). He further stated that his legal boxes were sent off to the "place where I was paroling to," meaning the Rockford Rescue Mission (*Id.* at p. 111). But he "never went home," rather he went to trial, was convicted, and sentenced to prison time in the Illinois Department of Corrections (*Id.*). He therefore claims that he "never gave . . . permission to send my box anywhere. If I had went home, that's when she's supposed to send it to me." (*Id.*). According to him, his property "was supposed to stay at Chester until I told them to send it somewhere else, but I never told them to send my legal box nowhere else, so my stuff is still supposed to be there right now as we speak. I didn't give nobody permission to send nothing nowhere" (*Id.* at pp. 40, 70).

Defendant Morris also testified that she left Plaintiff's unit prior to his actual discharge date and that Rhiana Draper took over for her (Doc. 143, p. 12; *see also* Doc. 142-3, p. 69 (Morris depo)). Plaintiff testified that on the day Morris told him she was leaving and would no longer be his therapist, he heard Morris tell Draper that he "needed [his] legal work" (Doc. 142-1, pp. 38–39, 55–56 (Plaintiff depo); *see also* Doc. 143, pp. 2, 12). Plaintiff said that when he looked up, he saw Morris wink at Draper and "I never got my legal work from them that day" (Doc. 142-1, pp. 37–38 (Plaintiff depo); *see also id.* at pp.

55–56; Doc. 143, pp. 2, 12). It is undisputed that another individual was present for Morris's statement and wink. Defendants assert that it was Cheryl Simmons (Doc. 142, p. 3), which Plaintiff admitted (Doc. 143, p. 2). But then Plaintiff subsequently asserted it was Shirley Forcum (Doc. 143, p. 12), which Defendants did not deny. At various times during his deposition, Plaintiff gave three different names. He first testified that Morris was talking to his "new therapist," who was Rhiana Draper, and "Shirley," meaning Shirley Forcum, the unit director (Doc. 142-1, pp. 38–39). Next, he testified that Morris was talking to "Rhiana" and "Cheryl," meaning Cheryl Simmons, the office coordinator (Doc. 142-1, pp. 55–56). And later, he testified that Morris was talking to Rhiana and "Shirley Simmons," which is a transposition of Shirley Forcum and Cheryl Simmons' names (Doc. 142-1, p. 112).

Rhiana Draper confirmed that she took over Carri Morris's caseload on or about August 22, 2018, which was seven days before Plaintiff's discharge on August 29th (Doc. 143, p. 12; *see also* Doc. 142-6, pp. 10–11 (Draper depo)). Defendant Draper testified that she believed Plaintiff had been found fit to stand trial and was being discharged to the Illinois Department of Corrections (which is incorrect; he was discharged back to Winnebago County Jail) (Doc. 143, p. 13; *see also* Doc. 142-6, p. 10-13 (Draper depo)). Draper testified that when she took over for Morris, all of Plaintiff's discharge paperwork was already complete, so her job was essentially finished (Doc. 142-6, pp. 13, 15). She further explained, "really it's just maintenance at that point, making sure that he's ready to go, making sure all the paperwork is filled out, if he has any questions, [etc.]" (*Id.* at p. 15). Draper testified that she did not recall ever seeing the Authorization Form indicating

that Plaintiff's property to be sent to the Rockford Rescue Mission prior to her deposition (*Id.* at pp. 12–13). She further testified that she did not make any changes to the Authorization Form and did not have any conversations with Plaintiff about changing the location of where his property was to be sent because he said "he didn't need anything" and "did not want to meet with [her]" (Doc. 143, p. 13; *see also* Doc. 142-6, pp. 14–15 (Draper depo)). Plaintiff, on the other hand, testified that before he was discharged, Draper told him that they would send him his legal boxes (Doc. 143, p. 13; *see also* Doc. 142-1, p. 40 (Plaintiff depo)).

There is a handwritten notation at the bottom of the Authorization Form, which states: "11-1-19 ALL your property was sent to the address of your choice. See Above. Any further questions about property should be addressed to the above person/facility." (Doc. 143, p. 13; *see also* Doc. 143-4 (form)). Shirley Forcum testified that the handwriting is hers and that "the facility" would have sent Plaintiff's property to that address (Doc. 143, p. 13; *see also* Doc. 142-2, p. 16 (Forcum depo)). Shirley Forcum further testified that she received a letter from Plaintiff saying he never received his property and that she investigated that claim by checking with the Property Department (Doc. 143, p. 14; *see also* Doc. 142-2, pp. 16–17 (Forcum depo)). Defendant Forcum stated that the Property Department "had a record of sending it and not receiving it back." (Doc. 143, p. 14; *see also* Doc. 142-2, p. 17 (Forcum depo)).

Counsel for Plaintiff subsequently requested the Property Department's documentation reflecting that transfer of property (Doc. 142, p. 14; *see also* Doc. 143-5 (emails regarding documentation)). On January 20, 2023, counsel for Defendants

provided another copy of the typed Personal Property Inventory and with a piece of paper that had "Bryon Champ, c/o Rockford Rescue Mission, 715 West State Street, Rockford, IL 61102" typed on it (Doc. 143-8). Plaintiff does not indicate whether any explanation was provided as to how these documents served to show Plaintiff's property was sent out (*see* Doc. 143), and the documents themselves do not include anything that indicates if and when Plaintiff's property was sent out (*see* Doc. 143-8). The Court notes, however, a different copy of the typed Personal Property Inventory contains handwritten notes that say "Discharged 8/29/18[,] rec'd address 8/29/18[,] Mailed out 9/4/18" (Doc. 143-1, p. 2).

Plaintiff testified he never received his legal box (Doc. 142, p. 3). Plaintiff's counsel issued a subpoena to the Rockford Rescue Mission and was told the Mission did not have any personal property of Bryon Champ from Chester Mental Health Center (Doc. 143, pp. 15–16; *see also* Doc. 143-7 (email chain)).

As a staff psychiatrist, Dr. Vallabhaneni's duties included evaluating, diagnosing, and treating psychiatric patients that were admitted to Chester, and making final discharge recommendations for those patients (Doc. 143, p. 8; *see also* Doc. 141-2, pp. 13–14 (Vallabhaneni depo)). Dr. Vallabhaneni testified that he had no involvement whatsoever with Plaintiff's legal box (Doc. 143, p. 9; *see also* Doc. 141-2, pp. 85–88). He never saw it, never talked to Plaintiff or anyone else about it, and was not involved in forwarding it when Plaintiff left Chester (Doc. 141-2, pp. 85–88). Plaintiff testified, however, that he believed Dr. Vallabhaneni was involved in retaliating against him for filing lawsuits because he had influence and control over Plaintiff's therapists, so if Dr.

Vallabhaneni told Morris and Draper not to help Plaintiff access or perform legal work, they would follow that directive (Doc. 143, p. 15; *see also* Doc. 142-1, pp. 94–99).

As office coordinator for Unit A, Cheryl Simmons testified that she processed patients' incoming mail once it was brought to the unit (Doc. 142-4, pp. 7, 16–17). For example, if a patient received a package of clothing, she would fill out the proper form and send it down to the clothing department; if a patient received property that they could not have on the unit, she would send it to the property department (*Id.*). Simmons testified that she did not inventory patients' personal property when they arrived (*Id.* at pp. 8, 10, 11–12). And she did not forward patients' personal property when they left Chester; that was the job of the patient's therapist and the property department (*Id.* at pp. pp. 13–14, 15–16). Simmons testified that she did not recall ever seeing Plaintiff's property box, she never communicated with him or anyone else about his property box, and she was not in charge of forwarding it once he was discharged (*Id.* at pp. pp. 14–15, 17). Plaintiff, however, testified he believed Defendant Simmons coordinated with his therapist to send his clothing and legal boxes away because "her job" was "my legal box, my clothes, the mail" and "the trust fund balance" (Doc. 143, p. 5; *see also* Doc. 142-1, pp. 61–62, 70, 102–03 (Plaintiff depo)).

As a forensic coordinator at Chester, Wayne Womac arranged the admission and discharge of individuals, oversaw the submission of court reports to a patient's admitting court, and oversaw communication with the admitting courts (Doc. 143, p. 5; *see also* Doc. 142-5, p. 9 (Womac depo)). Plaintiff admits that Defendant Womac had nothing to do with his legal box (Doc. 143, p. 6; *see also* Doc. 142-1, p. 65 (Plaintiff depo)).

## ANALYSIS

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

The gist of Plaintiff's retaliation claim in this case is that his legal boxes were sent to a place where he was not going to be residing and have never been returned to him. To prevail on his First Amendment retaliation claim, he must show: (1) he engaged in activity protected by the Constitution; (2) Defendants took action against him that was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) his protected activity was a motivating factor in Defendants' decision to subject him to the adverse treatment. *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (citing *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015).

Here, it is undisputed that Plaintiff had pending lawsuits when he arrived at Chester and that he filed a number of grievances while he was there. That suffices to show he engaged in protected activity. *See Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016)

(detainee's grievances are protected by the First Amendment). Additionally, a reasonable jury could find that being deprived of all of one's personal property is treatment sufficiently adverse that it is likely to dissuade a person of ordinary firmness from exercising further First Amendment activity. *See Morris v. Scott*, 840 Fed. Appx. 14, 15 (7th Cir. 2021) (holding a targeted search and the confiscation of property was a deprivation sufficient to support a retaliation claim); *Gully v. Hundley*, No. 3:17-CV-211-NJR-MAB, 2019 WL 4727698, at *4 (S.D. Ill. Sept. 27, 2019) (implying that inmate who received false disciplinary tickets and had items stolen from his cell suffered a deprivation sufficient to support a retaliation claim); *Taylor v. Hunziker*, No. 16-CV-3309, 2018 WL 4326804, at *1 (C.D. Ill. Sept. 10, 2018) ("[A] rational juror could find that destroying an inmate's property is a sufficiently adverse action to deter an ordinary prisoner from filing grievances."); *Birdo v. Gomez*, No. 13-CV-6864, 2016 WL 4011227, at *18 (N.D. Ill. July 27, 2016) (finding that inmate suffered a sufficient deprivation to support a retaliation claim when officials threw his personal items in the trash and ordered him to be transferred to a different facility).

However, there is no evidence that some of the Defendants were personally involved in the purported retaliatory conduct of mishandling Plaintiff's legal boxes by sending them to an improper address or causing them to be lost. "Individual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation." *Carmody v. Board of Trustees of University of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018). Plaintiff admitted that Defendant Wayne Womac had nothing to do with his legal box. Womac is therefore entitled to summary judgment.

The evidence shows that Dr. Vallabhaneni was also not involved in the retaliatory conduct at issue. Dr. Vallabhaneni testified unequivocally that he had no involvement whatsoever with Plaintiff's legal boxes and played no part in forwarding them when Plaintiff left Chester. Plaintiff nevertheless seems to believe that Dr. Vallabhaneni was involved in some capacity based on Dr. Vallabhaneni's position as the staff psychiatrist (*see* Doc. 143, pp. 14–15, 18). This amounts to nothing more than speculation that Dr. Vallabhaneni had some influence over how Plaintiff's legal boxes were handled, and speculation cannot defeat summary judgment. *Bass v. Joliet Pub. Sch.Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[I]t is well-settled that speculation may not be used to manufacture a genuine issue of fact.") (citation omitted). *See also Taylor v. Ways*, 999 F.3d 478, 493–94 (7th Cir. 2021) ("There is no such thing as *respondeat superior* liability for government officials under § 1983. The supervisor is therefore liable only if she was personally involved in . . . a subordinate's constitutional violation[, which] requires supervisors to "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). Dr. Vallabhaneni is therefore entitled to summary judgment.

Plaintiff's evidence is also insufficient for a reasonable jury to infer that Cheryl Simmons was involved in the purported retaliatory conduct. Cheryl Simmons unequivocally testified that, as the office coordinator, her job did not include forwarding a patient's personal property when they left Chester and that she had nothing to do with forwarding Plaintiff's property when he was discharged. Plaintiff suggests that Simmons

was involved based on his belief that her job entailed handling property and the mail, and his assertion that Carri Morris told Simmons that he would need his property (Doc. 143, pp. 4–5, 14, 18 (citing to Doc. 142-1, pp. 38–40, 55–56)). Again, Plaintiff's unsupported speculation as to what Simmons' job entailed is not enough to create an issue of fact and survive summary judgment. Neither is his testimony that Simmons was on the receiving end of Carri Morris's wink given Plaintiff's contradictory testimony as to whether Simmons was actually present. Furthermore, even if the Court assumes Simmons was present for the wink, the most a jury could infer is that Morris was signifying Simmons should withhold Plaintiff's legal boxes from him on that particular day (*see* 142-1, pp. 37–38, 55–56 (Plaintiff depo)). No reasonable jury would conclude that the wink was Morris's way of signifying that Simmons should play along with Morris's retaliatory scheme to have Plaintiff's property sent to the Rockford Rescue Mission or to ensure that it was lost in order to retaliate against him for filing lawsuits and/or grievances. That conclusion is simply too tenuous and unsupported, particularly given that there is no evidence Simmons knew anything about where Plaintiff's property was being sent or had anything to do with sending it there. Simmons is therefore entitled to summary judgment.

The same goes for Shirley Forcum. It is undisputed that Forcum did not fill out the Authorization Form to send Plaintiff's property to the homeless shelter. And Plaintiff did not put forth any evidence that Forcum otherwise saw, reviewed, approved, or handled the Form in any fashion after it was filled out by Morris. Rather, Plaintiff's only evidence seems to be his own subjective belief that Forcum played some role in forwarding his property based on her position as unit director, and his assertion that Carri Morris told

Forcum that he would need his property (Doc. 143, pp. 12, 14, 18 (citing to Doc. 142-1, pp. 38–40, 55–56)). As with Dr. Vallabhaneni and Cheryl Simmons, Plaintiff's speculation as to what Forcum's job entailed is not enough to establish an issue of fact. And neither is his changing story as to whether Forcum was on the receiving end of Carri Morris's wink, for the same reasons as explained above with respect to Simmons. Furthermore, to the extent that Shirley Forcum's handwriting appears on the bottom of the Authorization Form, that only serves to show that she investigated where Plaintiff's property was sent after-the-fact. It does not in any way show that she had a role in designating where Plaintiff's property was sent or otherwise knew before it was sent out. Shirley Forcum is therefore entitled to summary judgment.

That leaves Carri Morris and Rhiana Draper. It is undisputed that Carri Morris filled out the authorization form to have Plaintiff's property sent to the Rockford Rescue Mission. She testified that she did so because that is the location Plaintiff gave her. (Rhiana Draper corroborated that therapists fill out the authorization form based on the information the patient gives them.) And, perhaps most crucially, Plaintiff **signed** the authorization form, affirming that he wanted his property to go to the Rockford Rescue Mission. At his deposition, Plaintiff did not deny that he provided Morris the information for the Rockford Rescue Mission. In fact, he seemed to admit that he told Morris to have his property sent there. But he apparently thought it would not be sent there until he "went home" and was paroled to the Rockford Rescue Mission and that it would otherwise be held at Chester indefinitely until he asked for it to be sent. Plaintiff did not, however, put forth any evidence that leaving his stuff at Chester was actually an option

(*see* Doc. 143).[4]  The evidence in this case only suggests that Carri Morris was following the facility's standard procedure and therefore no reasonable jury could infer her actions were motivated by a desire to retaliate against Plaintiff for filing grievances and/or lawsuits.

As for Rhiana Draper, the Court does not see any basis for holding her liable. She was Plaintiff's therapist for the last week of his time at Chester. She testified that by the time she arrived, all of Plaintiff's discharge paperwork was completed. She further testified that she did not make any changes to the authorization form or have any conversations with Plaintiff about changes because he did not want to meet with her. Plaintiff does not dispute that he opted not to meet with Draper. Nor does he assert that he asked any questions about where his property was being sent or when it would be sent, or that he made any requests to change the location. He cites only to his testimony that Carri Morris told Draper that he would need his property and then winked, and that Draper told him before he left that they would send him his legal box (Doc. 143, pp. 14, 18). But neither of those things changes the fact that Draper did not fill out the authorization form or had any inclination that changes needed to be made to it. In fact, there is no evidence that, at the time of Plaintiff's discharge, Draper was even aware of where his property was going to be sent (*see* Doc. 146-2, pp. 12–13 (Draper's deposition testimony that she did not recall ever seeing the authorization form)). Furthermore, there is no evidence that she was aware of his lawsuits about excessive lockdowns (which had

---

[4] The Court has no reason to believe Chester has agreed to act as a storage unit and to be responsible for and safeguard the belongings of patients who have been discharged from the facility.

both been dismissed by the time she took over as Plaintiff's therapist) or any grievances that he had filed; again, she was only his therapist for about a week before he was discharged. Consequently, there is no evidence from which a reasonable jury could find that Defendant Rhiana Draper participated in having his property sent to the Rockford Rescue Mission in retaliation for him filing lawsuits and/or grievances.

In sum, all Defendants are entitled to summary judgment because there is simply no evidence that any Defendant was involved in the transfer of his personal property or, to the extent that they were involved, that their actions were motivated by retaliatory animus.

C<small>ONCLUSION</small>

The motions for summary judgment filed by Defendants Nageswararao Vallabhaneni (Doc. 140) and Defendants Cheryl Simmons, Carri Morris, Shirley Forcum, Rhiana Draper, and Wayne Womac (Doc. 142) are **GRANTED**. Plaintiffs' claims against these Defendants are **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment in Defendants' favor and to close this case on the Court's docket.

The Clerk of Court is further **DIRECTED** to place Document 143-2 **UNDER SEAL** because it contains personal identifying information for Plaintiff. *See* SDIL-LR 5.1(d).

**IT IS SO ORDERED.**

**DATED: September 29, 2023**

s/ Mark A. Beatty<br>
**MARK A. BEATTY**<br>
**United States Magistrate Judge**